UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GREGORY JOHNSON,                    :          PRISONER CASE NO.
         Plaintiff,                 :          3:18-cv-1881 (JCH)
                                    :
         v.                         :
                                    :
SCOTT SEMPLE, et al.,               :
         Defendants.                :          MARCH 27, 2019
                                    :
                                    :

INITIAL REVIEW ORDER

I.    INTRODUCTION

The plaintiff, Gregory Johnson ("Johnson"), incarcerated at the Northern

Correctional Institution ("Northern") in Somers, Connecticut, has filed a Complaint

("Compl.") (Doc. No. 1) pro se under section 1983 of title 42 of the United States Code.

Johnson sought leave to proceed in forma pauperis.  See generally Motion for Leave to

Proceed in forma pauperis (Doc. No. 9).  On December 4, 2018, the court granted

Johnson's application.  Order (Doc. No. 10).

The Complaint names fifteen defendants: Commissioner Scott Semple, Warden

Nick Rodriguez, Deputy Warden Derrick Molden, Captain Gregorio Robles, Correctional

Counselor Sarah Skribiski, Correctional Counselor Supervisor Carlene Davis,

Lieutenant Anderson, Director of Food Service Michael Bibens, Director of Health and

Addiction Services Colleen Gallagher, Health Services Administrator Richard Furey, Dr.

Carson Wright, Dr. Michael Clements, Dr. Omprakash Pellai, APRN Maria Bianchi, and

RN Victoria Kilman.  All defendants, except for defendants Semple, Bibens, and Gallagher, work at Northern.  Johnson contends that the defendants were deliberately indifferent to his serious medical needs, created a policy or custom under which he was deprived of adequate medical care, failed to adequately supervise and train subordinates, failed to provide a timely hearing upon his transfer to Northern, and failed to provide him with a notice regarding the change to his therapeutic diet before or after his transfer to Corrigan-Radgowski Correctional Center ("Corrigan").  Johnson seeks damages as well as declaratory and injunctive relief.

Under section 1915A of title 28 of the United States Code, the court must review prisoner civil complaints and dismiss any portion of a complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A. In reviewing a pro se complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[ ]."  Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007).  Although detailed allegations are not required, a complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief.  Bell Atlantic v. Twombly, 550 U.S. 544, 555–56 (2007).  Conclusory allegations are not sufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  Sykes v. Bank of

2

Am., 723 F.3d 399, 403 (2d Cir. 2013) (quoting Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)); see also Tracy v. Freshwater, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for pro se litigants).  However, notwithstanding this liberal interpretation, a pro se complaint will not survive dismissal unless the factual allegations meet the plausibility standard.  See, e.g., Fowlkes v. Ironworkers Local 40, 790 F.3d 378, 387 (2d Cir. 2015).

## II.   ALLEGATIONS

### A.  Medical Issues

Johnson has several physical disabilities.  Compl. at ¶ 40.  He has been diagnosed with a spinal cord injury, a fractured L5 vertebra, and arthritis in his back.  Id. at ¶ 41.  Because leg and foot issues prevent him from walking, he uses a wheelchair or walker.  Id. at ¶¶ 42-43.

In 2013, Johnson was diagnosed with glaucoma and ptyregium, a film-like cataract.  Id. at ¶ 53.  He underwent laser surgery to remove the ptyregium from one eye, but his requests for surgery on the other eye have been ignored.  Id. at ¶¶ 53-54.  On March 29, 2018, Johnson was stabbed in the left eye.  Id.  Prescribed medications have not resolved his eye issues.  Id.  Johnson requires surgery to repair the cut bottom lid.  Id.  Johnson also has been diagnosed with a cyst in his nasal cavity, a blood clot in his chest/heart, and hypertension.  Id. at ¶ 48.

In 2017, pursuant to a verbal agreement with the dietician, Johnson was provided a therapeutic diet.  Id. at ¶ 55.  The diet is high protein, soy-free, nitrate-free, and lactose-free.  Id.  Johnson has had problems obtaining this diet in several correctional facilities.  Id. at ¶ 56.  Defendant Bibens was aware of Johnson's diet.  Id. at ¶ 99.  In

June 2018, defendant Bibens met with Johnson at Northern.  Id.  They reached an agreement about his diet.  Id.  Soon after, kitchen staff failed to comply with the agreement.  Id.

On November 8, 2018, Johnson spoke with kitchen supervisor Kulp at Corrigan about his diet.  Id. at ¶ 57.  After being denied the diet for seven days, medical staff at Northern provided a copy of the agreement to Corrigan staff.  Id.  To date, the agreement is not honored in full.  Id.  Johnson contends that the meals lack flavor, seasoning, texture, appearance, temperature, and palatability.  Id.  Also, the quality and quantity are substandard.  Id.  Johnson also sent an email message to defendant Bibens.  Id. at ¶¶ 100-02.  He received no response to the message.  Id.  Johnson refuses to eat until the matter is resolved.  Id.

Johnson was diagnosed with hypertension in 2009 and prescribed medication. Id. at ¶ 60.  In August 2017, a doctor discontinued the medication because Johnson went on a hunger strike.  Id.  He was unable to get the prescription reinstated until July or August 2018.  Id.

On September 14, 2017, following numerous complaints to the medical unit, Johnson was diagnosed with a cyst in his nasal cavity.  Id. at ¶ 59.  The following day, he was diagnosed with a cyst on his kidney.  Id.  This diagnosis followed numerous complaints about lower back and abdominal pain.  Id.  The same day, Johnson underwent an echogram/stress test.  Id.  He could not perform the physical part of the test because of issues with his heart and legs/feet.  Id.  Johnson has a history of blood

4

clots and breathing issues.  Id.  His complaints about these issues have been ignored.
Id.

Also in September 2017, Johnson began experiencing cramps in his legs and
feet, muscle spasms, knee pain, back pain, and numbness.  Id. at ¶ 61.  He received
one steroid injection for a pinched nerve, but he had a reaction to the drug.  Id.  He has
taken several medications, but they have not relieved the pain.  Id.  Johnson has
noticed his toes "clawing-up."  Id.  Defendants Gallagher, Furey, Wright, Clements,
Pellai, and Bianchi did not order an MRI/CT scan, an orthopedic or neurology consult,
physical therapy, or medication to address his pain.  Id. at ¶ 62.

Defendant Furey was aware of Johnson's medical issues through conversations
and grievances.  Id. at ¶ 106.  On September 27, 2018, Johnson told defendant Furey
that he was unable to stand because of cramps in his legs and feet, muscle spasms,
knee pain, back pain, numbness, and a pinched nerve.  Id. at ¶ 107.  Defendant Furey
observed Johnson sleeping on the floor and crawling around.  Id. at ¶ 108.  He was
aware that Johnson was unable to use the toilet.  Id.  On August 9, 2018, Johnson
heard a doctor leave a message for defendant Furey.  Id. at ¶ 109.  The doctor asked
defendant Furey to call him about a medical transfer for Johnson.  Id.

Defendant Dr. Wright examined Johnson several times in the medical infirmary at
Northern and was aware of his illnesses and impairments.  Id. at ¶ 110.  When Johnson
asked Dr. Wright about the wheelchair, Dr. Wright stated that the wheelchair cannot fit
inside the cells in the infirmary and that Northern has a "no wheelchairs in cells" policy
for general population.  Id.  Dr. Wright recommended that Johnson hold the walls for

5

balance and offered to get him a few extra blankets for the floor.  Id.  Dr. Wright told

Johnson that he was not on a medical hold and could not remain in the infirmary.  Id. at

¶ 111.  Dr. Wright said he would order physical therapy and an MRI, but later reneged.

Id.  When Dr. Wright sent an officer to get Johnson for sick call, Dr. Wright told the

officer to make Johnson walk and not give him a wheelchair.  Id.

On July 17, 2018, defendant Dr. Clements ordered that Johnson be allowed to

take showers in the infirmary.  Id. at ¶ 112.  He also ordered physical therapy and an

MRI.  Id.  These orders were never carried out.  Id.  On August 9. 2018, Dr. Clements

ordered a medical transfer to an infirmary within 24 hours.  Id. at ¶ 113.  Before the

order was carried out, a nurse told Dr. Clements about Johnson's chronic illness and his

previous stay in the infirmary.  Id.  She also told him that the infirmary at MacDougall

was full and had no bed space.  Id.

On September 3, 2018, Johnson wrote to Dr. Clements and complained that he

was still at Northern.  Id. at ¶ 114.  Dr. Clements did not read the letter.  Id.  On

September 26, 2018, Dr. Clements spoke with Johnson about his MRI.  Id. at ¶ 115.  Dr.

Clements stated that Johnson's back was in worse condition than he had thought and

told Johnson that he would speak to defendants Rodriguez and Molden about

Johnson's health.  Id.

On September 27, 2018, a memo was issued permitting Johnson to use a

wheelchair in the housing unit.  Id. at ¶ 116.  Johnson told Dr. Clements that he still was

not receiving showers in the infirmary; could not ambulate and needed assistance from

a nurse; and was experiencing increased pain.  Id.  Dr. Clements stated that he

6

submitted a request to the Utilization Review Committee for physical therapy.  Id. at ¶ 117.  Although Dr. Clements said he would see Johnson for follow-up appointments in October 2018, this did not occur.  Id.  Dr. Clements prescribed pain medication but did nothing when Johnson reported that the medication was ineffective.  Id.

Johnson has a history with defendant Dr. Pellai.  Id. at ¶ 121.  In 2009, while he was confined at MacDougall-Walker Correctional Institution ("MacDougall"), Johnson experienced chest pain and difficulty breathing.  Id.  Dr. Pellai told him to exercise less and drink water.  Id.  Shortly after, Johnson experienced a stroke/heart attack.  Id.  Dr. Pellai kept the diagnosis from Johnson.  Id.  Following a stress test and EKG, Johnson was diagnosed with a blood clot in his chest.  Id. at ¶ 122.  He was placed on blood pressure and heart medications.  Id.  Dr. Pellai never told Johnson about the blood clot. He learned of it from a nurse.  Id.  Because the condition is hereditary, Johnson changed his diet.  Id.

In 2017, Johnson was experiencing an unsteady gait and was transferred to the MacDougall infirmary.  Id. at ¶ 123.  He remained there from June 27 through July 5, 2017.  Id.  Later that year, Johnson went on a hunger strike in protest over medical and safety issues.  Id.  He was returned to the MacDougall infirmary.  Id.  Dr. Pellai discharged Johnson from the infirmary while he was on the hunger strike.  Id. at ¶ 125. Johnson alleges that this action was in retaliation for complaints Johnson made about Dr. Pellai and for questioning Dr. Pellai in front of medical staff about his medical credentials and revocation of his license.  Id.

On August 7, 2017, Johnson returned to the facility from the hospital.  Id. at ¶ 126.  Following protocol, the nurse checked Johnson's blood sugar level.  Id.  When she reported the result to Dr. Pellai, he became upset.  Id.  He told the nurse that she should not have checked Johnson's level and ordered her to return Johnson to his housing unit.  Id.  Johnson lost consciousness twice during the night.  Id.  The nurse who came to his cell told Johnson that Dr. Pellai refused to have Johnson return to the infirmary.  Id.  Two days later, the warden arranged for Johnson to return to the infirmary.  Id.  Dr. Pellai tried to "get rid of" Johnson twice more by sending him to different correctional facilities, but Johnson was sent back to MacDougall both times.  Id.  On August 22, 2017, "they" tried to move Johnson to a room with other inmates.  Id.  When he refused, he was sent to RHU.  Id.

On August 22, 2018, Dr. Pellai falsified his examination of Johnson.  Id. at ¶ 127.  He was aware that Johnson was unable to get from the wheelchair to the examining table on his own.  Id.  Dr. Pellai cancelled Johnson's transfer to the infirmary.  Id.  Because of his Administrative Segregation status, Johnson could not go to another infirmary.  Id.

Defendant Bianchi called Johnson to the medical unit but refused to examine him when he said he could not get onto the examining table.  Id. at ¶ 128.  She threatened to cancel his wheelchair.  Id.  On October 23, 2018, Johnson was scheduled to go to state court.  Id. at ¶ 129.  He was taken in a regular vehicle with a metal seat, broken seatbelt, and bad shocks.  Id.  The arch in the seat caused Johnson severe back pain.

Id.  The transport unit officer asked correctional staff for a wheelchair.  Id.  Staff refused, stating that defendant Bianchi had cancelled the wheelchair order.  Id.

Defendant Kilman was aware of Johnson's impairments through his visits to the Northern infirmary.  Id. at ¶ 130.  She destroyed or refused to respond to his medical grievances.  Id. at ¶ 131.  Medical appointments in August and October 2018 were cancelled because defendant Kilman falsely reported that Johnson had refused the appointments.  Id. at ¶ 132.  Defendant Kilman failed to record Dr. Clements' order that Johnson be allowed to shower in the infirmary and then refused permission because there was no written order.  Id. at ¶ 133.  She also refused Johnson medical treatment by removing his name from the list to see Dr. Clements.  Id. at ¶ 134.

B.  Conditions of Confinement

In February 2016, prison officials received information that Johnson's life was in danger.  Id. at ¶ 58.  They did not investigate or take steps to protect him.  Id.  Several attempts to assault Johnson were made.  Id.  One was on March 29, 2018, at MacDougall.  Id.

In August 2017, Johnson refused to move to a room in the medical infirmary at MacDougall that housed several inmates.  Id. at ¶ 49.  As a result, he was placed in the restrictive housing unit ("RHU").  Id.  Johnson was placed on in-cell restraints and then on four-point restraints.  Id. at ¶ 50.  Johnson was restrained "for days, on and off."  Id. at ¶ 51.  He had limited mobility, was unable to use the bathroom, and was denied medical care and treatment.  Id.  Johnson also was required to sleep on a flat mattress.  Id.  Johnson identifies no defendant responsible for these alleged conditions of

9

confinement.  Id.  Johnson complained to Drs. Pellai and Naqvi about pain in his back and legs.  Id.  The pain medication he took was ineffective.  Id.

In early 2018, while he was confined at MacDougall, Johnson spoke with Commissioner Semple in P-pod, a unit for handicapped or disabled inmates.  Id. at ¶ 22.  Commissioner Semple saw Johnson using a wheeled-walker.  Id.  Johnson told Commissioner Semple that he required the walker and a wheel chair because he had lost muscle mass during a hunger strike lasting from July through October 2017.  Id.  On April 6, 2018, Johnson was transferred to Northern and placed in the medical infirmary.  Id. at ¶ 23.  Johnson told nurses and prison officials about his disabilities.  He asked staff for his walker and wheelchair to assist with mobility inside his cell.  Id.  Neither was provided.  Id.  Johnson's wheelchair status had expired, but the walker was approved for sixty days.  Id.

The medical infirmary at Northern is intended for psychiatric patients.  Id. at ¶ 24.  There are no ramps or handicap showers in the general population units.  Id.  Northern has a policy prohibiting wheelchairs in cells.  Id.  Defendants Semple, Rodriguez, Molden, Robles, Gallagher, Davis, Furey, Wright, Clements, Pellai, and Bianchi continued to confine Johnson at Northern.  Id. at ¶ 25.

While he was in the Northern medical infirmary in April 2018, Johnson specifically told defendant Rodriguez about his physical disabilities and argued that he should not be in Administrative Segregation.  Id. at ¶¶ 75-76.  After his release from the infirmary, Johnson continued to inform defendant Rodriguez about his issues.  Id.

10

On April 23, 2018, Johnson attended an Administrative Segregation hearing.  Id. at ¶ 26.  Johnson stated that he did not meet the criteria for Administrative Segregation placement, and he has physical disabilities.  Id.  On April 26, 2018, Johnson was approved for Administrative Segregation placement.  Id.  He remained on that status for seven months.  Id.

While in Phase 1, Johnson was confined in a small sensory deprivation cell for 24 hours a day.  Id. at ¶ 29.  He ate all meals in his cell.  Id.  Unlike all other inmates, he was not afforded one hour per day of out-of-cell recreation or three showers per week. Id.  Johnson also was precluded from work assignments and congregate programming. Id.

Johnson was confined in Administrative Segregation for 18 days before the hearing and 193 days after the hearing.  Id. at ¶ 30.  On September 27, 2018, he was advanced to Phase 2, but remained housed in Phase 1 until November 1, 2018, when he was transferred to Corrigan.  Id.  Johnson's Administrative Segregation status has been suspended for medical reasons, but he remains on six-month close monitoring. Id.  His sanctions, including loss of telephone privileges, visits, and commissary remain in effect.  Id.

Johnson was "victimized" by prison guards at Northern.  Id. at ¶ 31.  On his first day, he was required to lift his feet and was held against a wall for ten minutes while staff conducted a controlled strip search.  Id.  When Johnson complained about the pain, the guards told him he should not have come to Northern if he did not like pain. Id.  Johnson has been transported in vehicles not designed for handicapped persons.

11

Id.  Johnson was required to sit on a bench in a cell, remove his clothing, and throw it to officers to be searched.  Id.  If Johnson did not catch the clothing when it was thrown back to him, he had to remain without clothing until someone retrieved the clothing for him.  Id.  Johnson was required to sleep on the floor on a flat mattress, urinate in a cup, and defecate in food trays because he was unable to stand and walk.  Id. at ¶ 32.

Defendant Gallagher has been aware of Johnson's physical impairments since November 2017.  Id. at ¶ 102.  Although he has filed numerous ADA grievances and complaints, neither defendant Gallagher nor defendant Davis has investigated the complaints or accommodated his disabilities.  Id. at ¶ 103.  On July 15, 2018, defendant Gallagher sent Johnson a letter stating that he was approved to use a wheelchair for four months and would receive physical therapy.  Id. at ¶ 104.  Neither was provided. Id.  At no time was Johnson approved for wheelchair use in his cell.  Id. at ¶¶ 104-05.

On July 28, 2018, defendant Anderson, who was aware of Johnson's ambulatory issues from his time at MacDougall, told staff to put Johnson in a van with a broken seat for a trip to the hospital.  Id. at ¶¶ 96-97.  Johnson was unresponsive when he was placed in the van.  Id.  He awoke in a corner of the van with the seat belt around his neck.  Id.  Johnson requested that video footage be preserved but defendants Rodriguez and Molden conspired to destroy the footage.  Id. at ¶ 98.

On August 16, 2018, Johnson spoke to defendant Rodriguez about a disability issue.  Id. at ¶ 77.  Defendant Rodriguez told Johnson that he would not get a walker or wheelchair.  Id.  Defendant Robles interrupted the conversation and said that, according to the medical unit, the wheelchair is for use only in the hallway.  Id.

12

On August 30, 2018, Johnson was being reviewed for advancement to Phase 2. Id. at ¶ 78.  There were rumors that the Administrative Segregation program was moving from MacDougall to Corrigan.  Id.  Defendant Rodriguez told Johnson that staff at MacDougall did not want him there, and he was waiting to see what prison officials wanted to do with Johnson.  Id.  Advancement was denied.  Id.

On October 22, 2018, defendant Rodriguez toured Johnson's housing unit.  Id. at ¶ 79.  Johnson spoke with him about the wheelchair cancellation for use in the cell.  Id.  Defendant Rodriguez said that he would speak to defendant Gallagher about the issue. Id.  During this time, from August through November 2018, Johnson was sleeping on the floor of his cell because he was not able to get in or out of the bed.  Id. at ¶ 80.  He was unable to stand.  Id.  He had to urinate in cups and defecate in food trays because staff would not provide him a urinal or padded seat.  Id.  Defendant Rodriguez was aware of this condition but did nothing.  Id.

Defendant Molden was aware of Johnson's physical injuries, the wheelchair situation, the denial of legal calls, and the Johnson's living conditions.  Id. at ¶ 83. Johnson spoke with defendant Molden when he toured the housing unit and wrote him several times.  Id.

On September 26, 2018, Dr. Clements met with defendants Rodriguez and Molden about Johnson's health issues.  Id. at ¶ 84.  Following the meeting, a memo was sent to staff stating that Johnson is allowed a wheelchair in the housing unit.  Id. However, staff refused to assist Johnson in getting into the shower.  Id.  Johnson addressed the shower issue with defendant Molden, but he took no action.  Id.

Defendant Robles was aware of Johnson's physical impairments and the issues relating to the wheelchair.  Id. at ¶ 85.  Johnson spoke to defendant Robles about these issues when he toured the housing unit.  Id.  While Johnson was still housed in the infirmary, defendant Robles had approved use of the wheelchair for outdoor recreation. Id.

Johnson told defendant Davis about his living conditions when she toured the housing unit.  Id. at ¶¶ 93-94.  She did nothing to enable him to use bathroom facilities. Id.

On November 1, 2018, Johnson was transferred to Corrigan.  Id. at ¶ 135. Before and after his transfer, Johnson expressed concerns for his safety to the defendants and other prison officials.  Id.  He showed them paperwork supporting his claim and recent injuries.  Id.  Defendants Semple, Rodriguez, Molden, Robles, Skribiski, Davis, Anderson, and Pellai were aware of the safety issues and failed to address them.  Id. at ¶ 136.  The Department of Correction began an investigation.  Id. at ¶ 137.

C.  Legal Calls

Plaintiff made numerous complaints to defendant Robles that defendant Skribiski was denying him legal calls.  Id. at ¶ 86.  Defendant Robles took no action.  Id.  On August 22, 2018, an officer came to get Johnson for a legal call.  Id.  Because no wheelchairs were allowed in the housing unit, Johnson was refused the call.  Id. Defendant Robles refused to address the issue or provide Johnson wheelchair assistance; as a result, Johnson's lawsuit was dismissed.  Id. at ¶ 87.

14

Defendant Skribiski was aware of Johnson's physical impairments.  Id. at ¶ 88.
When making copies for him, she saw an injunction involving correctional officers she
knew, including her boyfriend.  Id. at ¶ 89.  Defendant Skribiski began to sabotage
Johnson's legal matters.  Id.  Between May and November 2018, defendant Skribiski
refused to give Johnson several legal calls.  Id. at ¶ 90.  During this time, Johnson was
on wheelchair status.  Id.  Johnson learned that defendant Skribiski was telling the
attorneys that he refused to come out of his cell for legal calls or visits.  Id. at ¶ 91.
Defendant Skribiski told the officers who were sent to get Johnson for legal calls that, if
he did not walk to the call, they should say he refused.  Id. at ¶ 92.  Johnson
complained to defendants Robles, Davis, Rodriguez, and Molden, but they did nothing.
Id.

Defendant Davis denied Johnson a legal call in October 2018.  Id. at ¶ 95.  An
unidentified correctional officer told Johnson that defendant Davis said that she would
say he refused the call if he did not come to her in an upstairs room.  Id.

## III.   ANALYSIS

Johnson asserts three counts in his Complaint.  In the First Count, he alleges
that the defendants were deliberately indifferent to his serious medical needs.  Id. at ¶
141.  In the Second Count, he alleges that the defendants created a policy or custom
under which he was deprived of adequate medical care and failed to adequately
supervise and train subordinates.  Id. at ¶ 144.  In the Third Count, Johnson contends
that the defendants failed to provide a timely hearing upon his transfer to Northern and
failed to provide him with a notice regarding the change to his therapeutic diet before or
after his transfer to Corrigan-Radgowski Correctional Center ("Corrigan").  Id. at ¶ 148.

Johnson asserts in his First Count that both the custodial and medical defendants were deliberately indifferent to his medical needs.  However, Johnson only offers conclusory allegations in support of the claims against the custodial defendants.  In particular, he alleges that defendants Semple, Rodriguez, Molden, Robles, and Davis did not attempt to treat his mental health problems, but instead punished him for behavior resulting from his mental illness.  Id. at ¶¶ 34-36.  However, the Complaint is devoid of factual allegations regarding (1) the circumstances and behaviors that led to Johnson's punishment, and (2) the defendants' involvement in the decision to punish Johnson.  Accordingly, these conclusory allegations fail to support a plausible claim against the custodial defendants for deliberate indifference to medical needs.

Below, the court will address Johnson's claims for (1) deliberate indifference to medical needs, as to the medical defendants; (2) deliberate indifference to conditions of confinement, as to the custodial defendants; (3) retaliation; (4) denial of access to courts; (5) procedural due process; and (6) supervisory liability.

A.      Deliberate Indifferent to Serious Medical Needs

Johnson alleges that he has not received proper medical treatment at Northern.  Id. at ¶ 36.  In particular, he alleges that defendants Gallagher and Furey have not developed an adequate treatment plan for Johnson.  Id. at ¶ 39.  He also alleges that defendants Dr. Wright, Dr. Clements, Dr. Pellai, APRN Bianchi, and RN Kilman have, inter alia, delayed or refused to implement treating physicians' orders, refused to transfer Johnson to the medical infirmary in a timely manner, provided Johnson with

16

ineffective pain medication, and delayed or refused to give Johnson a wheelchair.  <u>See</u>, <u>e.g.</u>, <u>id.</u> at ¶¶ 110, 117, 126, 128, 132.

The Eighth Amendment "forbids deliberate indifference to serious medical needs of prisoners, which includes needs for mental health care."  <u>Spavone v. N.Y. State Dep't of Corr. Servs.</u>, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks and citations omitted).  To establish a claim for deliberate indifference to a serious mental health need, the plaintiff must allege facts demonstrating two elements.  The first element is objective; "the alleged deprivation of adequate medical care must be sufficiently serious."  <u>Id.</u> (internal quotation marks omitted).  Under this objective element, a court must determine first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious."  <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279–80 (2d Cir. 2006).  A condition is considered serious if "a reasonable doctor or patient would find [it] important and worthy of comment," the condition "significantly affects an individual's daily activities," or if it causes "chronic and substantial pain."  <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998) (quotation marks omitted).

Johnson includes a litany of medical and mental health complaints ranging from a fractured vertebra and pinched nerve to a blood clot to PTSD and depression.  <u>See</u>, <u>supra</u>, at 3-9.  Johnson has alleged a serious medical need.

Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. <u>See</u> <u>Salahuddin</u>, 467 F.3d at 280.  Merely negligent conduct does not constitute

deliberate indifference.  Id. at 280.  Nor does a disagreement over proper treatment or diagnosis create a constitutional claim so long as the treatment was adequate.  Estelle v. Gamble, 429 U.S. 97, 107 (1976); Chance, 143 F.3d at 703.

This action focuses on treatment for Johnson's impairments that relate to his ability to walk.  He alleges that the defendants were made aware of his conditions through his medical records, complaints, and conversations.  See, supra, at 3-9.  He also alleges that many of the defendants observed his inability to walk in his cell or use toilet facilities.  See id.  Johnson alleges that defendants Gallagher, Furey, Wright, Clements, Pellai, and Bianchi failed to act to address his complaints of pain in his back, legs, and feet.  See id.  More specifically, Johnson alleges that defendant Furey ignored a doctor's order about a medical transfer for Johnson, see Compl. at ¶¶ 106-09; Dr. Pellai improperly diagnosed medical conditions, withheld diagnoses, refused to admit Johnson to the infirmary, and refused to treat a serious condition, see id. at ¶¶ 121-27; Dr. Wright ignored Johnson's need for a wheelchair, see id. at ¶ 110; Dr. Clements failed to ensure that his treatment orders were carried out, see id. at ¶¶ 112-17; and defendant Kilman failed to record and follow Dr. Clements' orders and removed Johnson's name from the list to see Dr. Clements, see id. at ¶¶ 130-34.

Beginning with Dr. Clements, the Complaint contains various allegations suggesting that Dr. Clements attempted to address Johnson's medical issues.  For example, Dr. Clements ordered an MRI and physical therapy.  Id. at ¶ 112.  Although Johnson states that he never received the MRI, he alleges that Dr. Clements met with him two months later to discuss the results.  Id. at ¶ 115.  Dr. Clements also ordered

18

Johnson's transfer to a medical infirmary.  Id. at ¶ 113.  However, the order could not be carried out because the infirmary had no available bed.  Id.  Dr. Clements ordered that Johnson have wheelchair access and be permitted to shower in the infirmary. Id. at ¶¶ 112, 117.  Although not all orders were carried out, the failure of most of the orders was not caused by Dr. Clements.  For example, Johnson alleges that defendant Bianchi cancelled the wheelchair access order, id. at ¶ 128, and defendant Kilman removed his name from a list to see Dr. Clements thereby preventing the follow-up exams in October 2018 and also failed to record, and later denied the existence of, the shower order, id. at ¶¶ 131-34.  The court concludes that Johnson has not alleges facts supporting a plausible claim against Dr. Clements for deliberate indifference to serious medical needs.  The claim against Dr. Clements is dismissed pursuant to section 1915A(b)(1) of title 28 of the United States Code.

Johnson alleges that defendants Furey, Bianchi, and Kilman deliberately failed to follow doctor's orders.  See Compl. at ¶¶ 106-08, 128, 130-34.  This allegation is sufficient at this stage of litigation to permit the deliberate indifference claims to proceed against them.

Johnson alleges that Dr. Wright dismissed Johnson's claimed need for a walker and wheelchair and told him that he would need to learn to walk again.  Id. at ¶ 110.  Dr. Wright ignored plaintiff's complaints of pain.  Id. at ¶¶ 110-11.  The court cannot, at this time, determine whether Johnson's claim against Dr. Wright is merely a disagreement over treatment or deliberate indifference to a serious medical need.  Thus, the court will permit the claim to proceed.

19

Johnson alleges that Dr. Pellai improperly diagnosed medical conditions, withheld diagnoses, refused to admit Johnson to the infirmary, and refused to treat a serious condition.  See id. at ¶¶ 121-27.  Although some of these allegations suggest negligence or malpractice, such as the improper diagnosis, the absolute refusal to admit Johnson to the infirmary and refusal to treat a serious condition support a claim for deliberate indifference to serious medical needs.  The claim against Dr. Pellai will proceed at this time.

    B.    Conditions of Confinement

A cognizable Eighth Amendment claim, based on unconstitutional conditions of confinement, requires allegations of fact which establish "both an objective element— that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the official acted, or omitted to act with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.'"  Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  A condition is objectively serious if it deprives an inmate of "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety."  Id. (quoting Helling v. McKinney, 509 U.S. 25, 32 (1993) (internal quotation marks omitted)).  To meet the subjective component, allegations must include that prison officials "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," that is, that they were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w that inference."  Id. at 185-86.

20

Johnson alleges that he was subjected to unconstitutional conditions of confinement because his physical impairments were not addressed.  He was required to live in deplorable conditions, was unable to use the toilet, and was not permitted to shower for months because he was not provided a wheelchair or walker and was not permitted to shower with assistance in the medical unit.  See, supra, at 9-14.  Johnson has alleged that defendants Rodriguez, Molden, Robles, Furey, Gallagher, Davis, and Anderson, were aware of his living conditions, but they did nothing to address them. See Compl. at ¶¶ 75-79, 83, 85, 93-94, 96-98, 102-105, 106.  These allegations are sufficient for the conditions claim to proceed against defendants Rodriguez, Molden, Robles, Furey, Gallagher, Davis, and Anderson.

Johnson also alleges that defendant Bibens arranged for Johnson to receive a therapeutic diet, but Bibens failed to ensure that he received it even after being notified of that fact.  See, supra, at 3-4.  As a result, Johnson was denied his special diet for seven days, and his meals continued to be substandard in terms of flavor, seasoning, texture, appearance, temperature, and palatability.  Compl. at ¶ 57.  This claim of inadequate nutrition will proceed because "[t]he Eighth Amendment requires nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."  Willey v. Kirkpatrick, 801 F.3d 51, 69 (2d Cir. 2015) (allowing a prisoner's Eighth Amendment claim to proceed where the prisoner alleged that his restricted diet, which consisted of stale bread and rotten cabbage, was "unusually unhealthy").

C.    Supervisory Liability

Johnson alleges that defendants Semple, Rodriguez, Gallagher, and Furey have not hired sufficient staff to provide adequate medical treatment and that defendants Rodriguez, Molden, Robles, Davis, Anderson, and Semple have not adequately trained staff at Northern in dealing with inmates with physical disabilities.

Defendant Semple is the Commissioner of Correction and defendant Gallagher is the Director of Health and Addiction Services for the Department of Correction.  All other supervisory defendants named in this claim are alleged to work at Northern.

To prevail on a claim for supervisory liability under section 1983, the plaintiff must provide evidence that the defendants were personally involved in the alleged constitutional violations.  See Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013).  Prior to the Supreme Court's decision in Iqbal, the Second Circuit held that personal involvement could be shown by demonstrating that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  In Iqbal, the Supreme Court emphasized that "supervisor liability" is a misnomer and should not be confused with respondeat superior.  Iqbal, 556 U.S. at 676-77.  The Supreme Court required that "a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution." Id. at 676.  The Court noted, however, that the required showing will vary depending on the constitutional question at issue.  Id. at 676.

In Iqbal, the constitutional issue involved invidious discrimination.  The Court found that the plaintiff was required to "plead and prove that the defendant acted with discriminatory purpose," id. at 676, and, therefore, that allegations that the supervisor knew "of his subordinate's discriminatory purpose" were insufficient.  Id. at 677.

The Second Circuit has not affirmatively decided whether Iqbal abrogates some or all of the Colon factors with respect to supervisory liability.  See Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015) (Colon factors may demonstrate personal involvement, provided "th[e] standard—be it deliberate indifference, punitive intent, or discriminatory intent—reflects the elements of the underlying constitutional tort"), reversed in part on other grounds sub. nom., Ziglar v. Abbas, 137 S. Ct. 1843 (2017); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal."); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations").

Until the Second Circuit affirmatively decides the issue, this court will assume that all five Colon factors may be used to establish supervisory liability, at least for claims requiring a showing of deliberate indifference.  Other district courts within the Second Circuit share this view.  See, e.g., Matteo v. Perez, No. 16-CV-1837(NSR),

2017 WL 4217142, at *4-5 (S.D.N.Y. Sept. 19, 2017) (assuming all five <u>Colon</u> factors apply where claim does not require showing of discriminatory intent); <u>Stamile v. County of Nassau</u>, No. 10-CV-2632 (AKT), 2014 WL 1236885, at *4 (E.D.N.Y. Mar. 25, 2014) (applying <u>Colon</u> in absence of clear direction from Second Circuit).

Defendants Semple and Gallagher are high-ranking officials.  <u>See</u>, <u>supra</u>, at 1-2. The only allegation against defendant Gallagher is a conclusory statement that she failed to develop a proper treatment plan for Johnson.  Compl. at ¶ 39.  This conclusory statement fails to demonstrate personal involvement in any of the ways set forth in <u>Colon</u>.

Johnson alleges only that he spoke with defendant Semple several months before his transfer to Northern.  <u>Id.</u> at ¶ 22.  Johnson told defendant Semple that he was using a walker and wheelchair because he had lost muscle mass during his hunger strike.  <u>Id.</u>  Johnson concludes, based on this conversation, that defendant Semple should have known that inmates with impaired ambulatory abilities should not have been transferred to Northern.  <u>Id.</u> at ¶¶ 23-25.  However, there are no factual allegations suggesting that the transfer itself constituted a violation of prison policy or federal law; that Semple directly participated in any of the alleged violations of Johnson's constitutional rights; or that Semple was aware of, or grossly negligent in supervising, subordinates who committed the alleged wrongful acts.  Accordingly, Johnson has not alleged a plausible claim of supervisory liability against Semple.

All other defendants named in this claim are supervisory officials at Northern. <u>See</u>, <u>supra</u>, at 1-2.  Johnson first argues that the defendants have not hired sufficient

staff to provide adequate medical treatment.  Compl. at ¶ 37.  As his lengthy statement of facts suggests, however, his issues are not that he submitted sick call requests and was not seen in a timely manner, but that certain staff members deliberately prevented him from being seen or interfered with the implementation of medical orders.  See, supra, at 3-9.  As Johnson alleges no facts suggesting an insufficient number of medical staff members at Northern, this claim is dismissed.

Johnson also alleges that defendants Rodriguez, Molden, Robles, Davis, Anderson, and Semple have not adequately trained staff at Northern in dealing with inmates with physical disabilities.  Compl. at ¶ 38.  To prevail on such a claim, Johnson must plausibly allege that these defendants "knew or should have known that there was a high degree of risk that [their] subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Plaintiff."  Samuels v. Fischer, 168 F. Supp. 3d 625, 638 (S.D.N.Y. 2016) (internal quotation marks omitted).  With respect to Semple, there are no factual allegations suggesting that Semple had actual or constructive notice of Johnson's conditions of confinement or alleged denials of medical care.  Thus, because conclusory allegations about negligent supervision or failure to train are insufficient to establish personal involvement, Johnson's failure to train claim against Semple is dismissed.  See, e.g., Hill v. Chapdelaine, No. 16cv1656(VLB), 2017 WL 62511, at *4 (D. Conn. Jan. 5, 2017) ("The plaintiff's conclusory allegation that [the]Warden . . . failed to properly train correctional staff . . . does not state a plausible claim for supervisory

liability."); Landron v. City of New York, No. 14 Civ. 1046(NRB), 2014 WL 6433313, at

*5 (S.D.N.Y. Nov. 7, 2014) (holding that supervisory liability would not lie where plaintiff

alleged merely that warden "grossly failed to train and properly supervise his corrections

officers").  In contrast, Johnson does allege that he informed defendants Rodriguez,

Molden, Robles, Davis, and Anderson of his alleged mistreatment by staff, and nothing

was done.  See Compl. at ¶¶ 75-76, 83, 85, 93-94, 96-98.  Accordingly, the supervisory

liability claim regarding failure to train staff will proceed against these defendants.

D.     Retaliation

Johnson alleges that, while he was confined at MacDougall, Dr. Pellai discharged

him from the infirmary while he was on a hunger strike and attempted to transfer

Johnson to other facilities to prevent his return to the MacDougall infirmary.  Compl. at

¶¶ 121-27.  He claims that Dr. Pellai acted in retaliation for complaints Johnson made

against him and for questioning his qualifications in front of medical staff.  Id. at ¶ 125.

To state a section 1983 retaliation claim, Johnson must demonstrate "(1)

protected speech or conduct, (2) adverse action by defendant, and (3) a causal

connection between the protected speech and the adverse action."  Bilal v. White, 494

F. App'x 143, 146 (2d Cir. 2012).  Because retaliation claims are easily fabricated, the

courts consider such claims with skepticism and require that they be supported by

specific facts.  Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015).  Conclusory

allegations of retaliatory conduct are not sufficient.  See id. (holding that First

Amendment retaliation claims brought by prisoners must "be supported by specific and

detailed factual allegations, not stated in wholly conclusory terms.") (quoting <u>Flaherty v.</u>
<u>Coughlin</u>, 713 F.2d 10, 13 (2d Cir. 1983)) (internal quotation marks omitted).

Making complaints and filing grievances is protected activity.  <u>See</u> <u>Gill v.</u>
<u>Pidlypchak</u>, 389 F.3d 379, 380 (2d Cir. 2004) (filing a grievance is constitutionally
protected activity and will support a retaliation claim).  Johnson's retaliation claim will
proceed against Dr. Pellai.

E.    Fourteenth Amendment

In his Third Count, Johnson asserts Fourteenth Amendment procedural due
process claims.  To state a due process claim, Johnson must allege that (1) he had a
protected liberty interest in remaining free from placement in Administrative
Segregation, and (2) if he had such an interest, that the defendants deprived him of the
interest without affording him due process of law.  <u>See</u> <u>Walker v. Fischer</u>, 523 F. App'x
43, 44 (2d Cir. 2013) (citing <u>Giano v. Selsky</u>, 238 F.3d 223, 225 (2d Cir. 2001)).
Furthermore, with respect to the first element of a due process claim, Johnson has "a
protected liberty interest only if the deprivation is atypical and significant and the state
has created the liberty interest by statute or regulation."  <u>Tellier v. Fields</u>, 280 F.3d 69,
80 (2d Cir. 2000) (internal quotation marks and alterations omitted).

Department of Correction Administrative Directive 9.4 ("AD 9.4"), Section 12(B)[1]
provides that an Administrative Segregation hearing shall be held "not later than 30
days after the completion of Administrative Detention pending an investigation or after

---

[1] The court takes judicial notice of the Department of Correction Administrative Directives.

the completion of Punitive Segregation sanctions."[2]  Johnson does not allege that he

was placed in Administrative Detention or that he was required to serve any Punitive

Segregation sanctions.  Thus, his hearing should have been held within thirty days of

his placement.  AD 9.4 at ¶ 12(B).  Johnson alleges that he was confined in

Administrative Segregation for eighteen days before his hearing.  Compl. at ¶ 30.

Johnson identifies no deficiencies at the hearing itself; he merely disagrees with the

decision.  See id. at ¶¶ 26-27.  As Johnson's hearing was held within the permitted time,

he has not identified any process he was denied in connection with the hearing.  Thus,

his due process claim based on his placement in Administrative Segregation fails.

Johnson also alleges that he was not given notice of the change to his

therapeutic diet when he was transferred to Corrigan.  Id. at ¶ 149.  Based on Johnson's

allegations, it appears that he failed to receive his special diet when he arrived at

Corrigan because the diet was not sent with him during the transfer.  See, supra, at 3-4.

Johnson alleges that he was deprived of his therapeutic diet for seven days.  Compl. at

¶ 57.  He also alleges that, even after Northern forwarded the therapeutic diet to

Corrigan, he received meals that had "no flavor" and that were below the "standard

requirement" in terms of "texture, appearance, temperature, and palatability."  Id.

In Collazo, the Second Circuit expressly declined to decide whether a prisoner

has a constitutionally protected interest in receiving a therapeutic diet, although it did

note the absence of any Second Circuit or Supreme Court cases establishing such a

right.  Collazo v. Pagano, 656 F.3d 131, 132 (2d Cir. 2011).  Likewise, this court need

---

[2] The DOC Administrative Directives are available at: https://portal.ct.gov/DOC/AD/AD-Chapter-9.

not reach this question in this case.  Regardless of whether state law gives Johnson an interest in his therapeutic diet, being deprived of this special diet for seven days does not impose an "atypical and significant" hardship sufficient to implicate Johnson's Due Process rights.  See McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004) (subjecting the plaintiff to a week-long "restricted diet" was not an "atypical and significant hardship") (internal quotations marks omitted); Mandala v. Coughlin, 920 F. Supp. 342, 352 (E.D.N.Y. 1996) (denying plaintiff a special, high fiber diet after his surgery did not abridge the plaintiff's Due Process rights).  Similarly, Johnson's "general allegations about food quality, preparation, and service fail to state a valid claim" under the Due Process Clause.  Roundtree v. City of New York, No. 15CV8198, 2018 WL 1586473, at *7 (S.D.N.Y. Mar. 28, 2018).  As a result, any Fourteenth Amendment claim relating to Johnson's diet is dismissed pursuant to section 1915A(b)(1) of title 28 of the United States Code.

F.    Access to Courts

Johnson includes claims against defendants Robles and Skribiski for denying him legal calls and visits.  See, supra, at 14-15.  He alleges that a lawsuit was dismissed because defendant Robles failed to provide him a wheelchair to get to a legal call and that defendant Skribiski indicated on several occasions that he refused to give Johnson legal calls or visits when he was unable to walk to the call or visit and no wheelchair was provided.

It is well settled that inmates have a constitutional right of access to the courts. See Lewis v. Casey, 518 U.S. 343, 350 (1996) (citing Bounds v. Smith, 430 U.S. 817,

821, 828 (1977)).  To state a claim for denial of access to the courts, Johnson is required to allege facts demonstrating that he suffered an actual injury as a result of the conduct of the defendants.  Id. at 351-55.  To establish an actual injury, Johnson must allege facts showing that the defendant took actions or was responsible for actions that hindered his efforts to pursue a legal claim.  Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (citations omitted).

Johnson alleges that a case was dismissed because of defendant Robles' actions.  Compl. at ¶ 87.  Thus, the access to courts claim will proceed against Robles. However, Johnson alleges no facts suggesting that he suffered any actual injury as a result of defendant Skribiski's actions.  See Stiggle v. Arnone, No. 3:13-cv-238(RNC), 2013 WL 5970956, at *4 (D. Conn. Nov. 8, 2013) (dismissing access to courts claim based on interference with legal mail and legal calls where no actual injury alleged); Kalican v. Dzurenda, No. 3:12-cv-1009(SRU), 2015 WL 1806561, at *5-6 (D. Conn. Apr. 21, 2015) (dismissing access to courts claim based on delayed legal calls because plaintiff alleged no facts demonstrating an actual injury).  Accordingly, the access to courts claim against Skribiski is dismissed pursuant to section 1915A(b)(1) of title 28 of the United States Code.

G.    Declaratory Relief

Johnson seeks a declaratory judgment that the defendants violated his Eighth and Fourteenth Amendment rights.

Declaratory relief operates prospectively.  It is intended to enable parties to adjudicate claims before either party suffers significant damages.  Orr v. Waterbury

30

Police Dep't, 2018 WL 780218, at *7 (D. Conn. Feb.8, 2018) (citations omitted).  In Orr,

the court dismissed the request for declaratory relief because the request related only to

past actions; the plaintiff had not identified any legal issue that could be resolved by

declaratory relief.  Id.  Johnson seeks a declaration regarding past actions. See Compl.

at 30 ("A declaratory judgment that the actions of Defendants violated the Fifth, Eighth

and Fourteenth Amendments of the United States Constitution.").  The request for

declaratory relief is inappropriate[3] and dismissed pursuant to section 1915A(b)(1) of title

28 of the United States Code.

## ORDERS

The Fourteenth Amendment claims, the deliberate indifference claim against Dr.

Clements, the claim that defendants failed to hire sufficient medical staff at Northern,

the supervisory liability claim regarding staff training against defendant Semple, the

access to courts claim against defendant Skribiski, and the request for declaratory relief

are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b) without prejudice.

The case will proceed on the deliberate indifferent to medical needs claims

against defendants Wright, Pellai, Bianchi, Furey, and Kilman; the conditions of

confinement claims against defendants Rodriguez, Molden, Robles, Furey, Gallagher,

---

[3] The court notes that, if Johnson were to prevail on any of his claims, a judgment in his favor would serve the same purpose as a declaration that the defendants had violated his rights regarding that claim. Thus, any request for declaratory relief is redundant.  See Camofi Master LDC v. College P'ship, Inc., 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006) (concluding that a claim for declaratory relief that is duplicative of the claims underlying the action serves no purpose); White v. Eberle, No. 3:17-CV-717 (SRU), 2017 WL 2562844, at *2 (D. Conn. June 13, 2017) (dismissing the plaintiff's claim for declaratory relief because, "[i]f [the plaintiff] were to prevail on his substantive claims, the court necessarily would determine that the defendants had violated his right to due process").

31

Davis, Anderson, and Bibens; the supervisory liability claims regarding training staff against defendants Rodriguez, Molden, Robles, Davis, and Anderson; the retaliation claim against Dr. Pellai; and the access to courts claim against defendant Robles.

The court enters the following orders:

(1)    **The Clerk shall** verify the current work addresses for defendants Wright, Pellai, Bianchi, Kilman, Rodriguez, Molden, Robles, Furey, Gallagher, Davis, Anderson, and Bibens with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet to each defendant at the address provided within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver requests on the thirty-fifth day after mailing.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the defendant in his individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2)    **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service.  The U.S. Marshal is directed to effect service of the complaint on defendants Wright, Pellai, Bianchi, Kilman, Rodriguez, Molden, Robles, Furey, Gallagher, Davis, Anderson, and Bibens in their official capacities at the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141, within **twenty-one (21) days** from the date of this Order and to file a return of service within thirty (30) days from the date of this Order.

(3)    T**he Clerk shall** send Johnson a copy of this Order.

32

(4)   **The Clerk shall** send a courtesy copy of the Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5)   The defendants shall file their response to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claim recited above.  They also may include all additional defenses permitted by the Federal Rules.

(6)   Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this Order. Discovery requests need not be filed with the court.

(7)   All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this Order.

(8)   Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9)   If Johnson changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court.  Failure to do so can result in the dismissal of the case.  Johnson must give notice of a new address even if he is incarcerated.  Johnson should write PLEASE NOTE MY NEW ADDRESS on the notice.  It is not enough to just put the new address on a letter without indicating

33

that it is a new address.  If Johnson has more than one pending case, he should

indicate all the case numbers in the notification of change of address.  Johnson should

also notify the defendants or the attorney for the defendants of his new address.

(10)    Johnson shall utilize the Prisoner Efiling Program when filing documents

with the court.  Johnson is advised that the Program may be used only to file documents

with the court.  As local court rules provide that discovery requests are not filed with the

court, discovery requests must be served on defendants' counsel by regular mail.

**SO ORDERED.**

Dated this 27th day of March 2019 at New Haven, Connecticut.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge